## MANNING *v.* POTOMAC ELECTRIC POWER COMPANY

[No. 134, September Term, 1962.]

*Decided January 17, 1963.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY, and MARBURY, JJ.

*Henry A. Babcock,* with whom was *Thomas O. King* on the brief, for appellant.

*Jerrold V. Powers,* with whom were *Sasscer, Clagett & Powers* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

After the chancellor decreed that a plaintiff was entitled to specific performance of an option to purchase real estate, the defendant appealed.

Two questions are presented: (1) Was the option contract fair and reasonable, in the sense that these terms are used in the law relating to specific performance, so as to justify the relief granted?; and (2) Did the availability of the right of eminent domain oust the jurisdiction of the equity court to grant specific performance?

In 1958, the defendant below, Mrs. Manning, acquired a

tract of 6.74 acres of land near Laurel, in Prince George's County, from her brother and sister-in-law for about $520 per acre. Soon after the land's acquisition, an agent of the plaintiff obtained the defendant's permission to survey her property for the purposes of acquiring land for a prospective electrical transmission line. This survey work was completed in September of 1959. In February, 1960, appellee's representative called upon Mrs. Manning, and she signed an option granting appellee the right to purchase 2.537 acres of her back land, having no road frontage, for $2,300, about $900 per acre. The option was accompanied by a plat, which was also signed by the appellant. This option was duly exercised by the appellee by letter in March, 1960. Thereafter, when the appellant refused to comply with the agreement, the appellee filed suit for its specific enforcement.

I

It will be unnecessary to state in great detail the law relating to specific performance. In *Brooks v. Towson Realty, Inc.,* 223 Md. 61, 69, 162 A. 2d 431, we quoted from 5 *Corbin, Contracts,* § 1162, as follows: "Facts that are not sufficient to invalidate a contract and that may nevertheless be sufficient to induce the refusal of a decree for specific enforcement are commonly segregated under such headings as mistake, innocent misrepresentation, unconscionable contract, inadequacy of consideration, harshness, oppression, sharp practice, overreaching, as well as hardship. * * * In combination several such facts may be sufficient to prevent specific enforcement, even though no one of them standing alone would be sufficient." See also Restatement, *Contracts* § 367. And in *Straus v. Madden,* 219 Md. 535, 543, 150 A. 2d 230, we pointed out that if there be nothing but inadequacy of price involved, the inadequacy must be extreme in order to call for the interposition of equity, either offensively or defensively. However, where the inadequacy does not stand alone, but is accompanied by other inequitable incidents, relief is much more readily granted.

Appellant attempts to bring her situation within the above stated principles by claiming: that the purchase price was in-

adequate; that if she be required to perform the contract, she will be left with a small triangular shaped piece of property, landlocked, and completely separated from the remainder of her tract; that appellee's "professional right-of-way agent and negotiator" was without "any qualifications to determine the value of real estate"; that the appellant was a woman sixty years of age, who had always worked on a farm, and, consequently, was not able to cope with appellee's agent; that this agent told her that if she did not sell the property to the appellee, appellee could condemn it; and if she be required to comply with the contract, the appellee will have a right of ingress to, and egress from, its property (using as far as practical existing roads) over the remainder of her property, and the right, from time to time, to cut down and trim trees and brush upon her adjoining land.

The chancellor found the agreement was executed by Mrs. Manning without fraud, misrepresentation or other improper conduct on the part of the appellee or its agents, but that sometime after its execution, she came to the conclusion that she should have received more money, which was the real nub of her complaint. We agree.

The only testimony concerning the value of the property was the price paid for it by the appellant in 1958 (about $520 per acre); the statement of appellee's negotiator, who was an appraiser of considerable experience, that in his opinion the price named in the option (about $900 per acre) was the fair market price of the property in 1960; and the testimony of a Mr. Benson, a real estate broker produced by the appellant, that he thought it was worth $2,500 per acre (presumably in 1962). The chancellor indicated that Mrs. Manning, possibly, had let her property go for something less than she could have obtained from the appellee had she demanded more. But he made no finding of an inadequacy of the price actually received by her, which is a far cry from an affirmative finding of an extreme or unconscionable inadequacy, necessary to refuse specific performance on the ground, of inadequacy alone. Clearly, the above evidence did not require a finding of such a pronounced and inordinate inadequacy as to shock the

conscience of the court, so we proceed to a consideration of appellant's other complaints.

Here, too, her evidence is lacking in many aspects; and the arguments advanced by her are not, in all instances, sound. Referring to the small landlocked parcel of ground title to which will remain in her, a plat showing the property to be conveyed and that to be retained was exhibited to, and signed by, the appellant at the time she signed the option. Of course, she had a right to deal with her property as she saw fit. In addition, the agreement permitted her to use, for agricultural purposes, the land conveyed to the appellee, which means that the little parcel will not, in fact, be landlocked. If it be necessary to answer the claim that appellee's negotiator had no qualifications to determine the value of real estate, it may be simply done by merely stating that the evidence discloses that Mr. Hoffman had been employed by the appellee, for four years, in its Real Estate Department, and his duties there included the procuring of options on real estate needed by the appellee for the operation of its business. Also, he had had experience with previous employers "in that same general line," and had "done appraisals for various individuals, attorneys, etc. * * *." The claim that appellant could not cope with appellee's agent is answered by a simple reading of appellant's testimony concerning the execution of the option. She makes no claim of mistake, misrepresentation, oppression, sharp practice or overreaching. Her entire testimony consumes but three pages in the record extract. In response to a question as to whether she remembered what Mr. Hoffman, appellee's agent, told her when she signed the option, she replied: "Well, I don't remember exactly what he told me, he asked me to sign it, and I said, well I guess I might as well, if I don't then what? He said, well they could condemn it and take you to Court [which was an accurate statement], so I thought it was the right thing to do and I signed it." She further stated that she knew the purchase price was named in the option. And we find nothing unusual in the provisions permitting the right of ingress and egress "using as far as practical existing roads," and the trimming and removal of

trees and brush that are "liable to interfere with, or fall upon, any towers, poles" etc. Here, again, Mrs. Manning was at liberty to deal with her property in any manner she deemed propitious to her best interests. Surely, these latter provisions would not warrant a finding of such hardship, or of such an unconscionable contract, as to deny specific enforcement.

## II

This contention is a rather unusual one. If appellant's version thereof is to be sustained, it requires a holding to the effect that the doors of courts of equity are closed to any contract-purchaser of real property, which has the power of eminent domain, and such contract-purchaser must resort to a condemnation proceeding to acquire title to the real estate involved. Such a ruling would defeat one of the fundamental and original reasons for equitable relief, especially that of specific performance, as we shall point out shortly.

Appellant's theory is that the equity court lacked jurisdiction to grant specific performance, because the plaintiff had "another complete and adequate remedy at law, to-wit, the right of eminent domain." Of course, as a general rule, equity does not grant relief where there is a complete and adequate remedy at law; hence, it may not be inappropriate to discuss, briefly, the origin of the principle, the reasons for its existence, and how, if at all, it applies in the case at bar.

The authorities seem in accord that equitable jurisdiction, as distinguished from jurisdiction at law, is based mainly upon an application of the maxim "Equity suffers no wrong to be without a remedy." [1] At a very early date, a procedure was established in the common-law courts of England, whereby a small number of "forms of actions" were furnished as the exclusive means of seeking redress in those courts. Frequently, where a litigant was justly entitled to relief, the facts of his case failed to fall within one of these "forms of action," and the case was consequently dismissed. The English common-

---

1. Story, Equity Jurisprudence (14th Ed.) § 94; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 423, 424; Hanley v. Stulman, 212 Md. 273; Spence, Equitable Jurisdiction of the Court of Chancery.

law judges, for the main part, set themselves firmly for a strict adherence to these arbitrary and technical forms, and opposed any innovations that might have brought the law as a whole into harmony with justice and equity. Also at a very early date, the Crown (aided by the Special Council, the predecessor of the Privy Council) began to exercise a prerogative, which embraced a judicial function over matters that did not, or could not, come within the jurisdiction of the ordinary courts. This extraordinary or prerogative judicial function, originally exercised by the Crown, afterwards was delegated (in addition to his manifold other duties, which included the exercise of ordinary—*i.e.,* common law-jurisdiction in his court) to the Chancellor. This extraordinary equitable jurisdiction of the Chancellor, although ill defined in its beginning, grew rapidly, and by the time of the reign of Edward III (1312 to 1377) the Court of Chancery was recognized as the ordinary tribunal wherein to decide causes which required an exercise of the prerogative jurisdiction, and the granting of special remedies which the common-law courts could not, or would not, give. And equitable jurisdiction has grown through the years until it is now based upon certain and definite rules, principles and doctrines of fairness, justice and equity.[2]

The maxim "Equity will not suffer a wrong to be without a remedy," when considered literally, is very broad and general in scope and nature. However, as it is employed to define and regulate equitable jurisdiction as distinguished from jurisdiction at law, it has certain well-defined and important limitations as pointed out by Mr. Pomeroy in the second volume of his *Equity Jurisprudence,* in §§ 423, 424. He summarizes what is said in the two sections as follows:

"In order that the principle may apply, one of three facts must exist, viz., either. 1. The right itself

2. This is a "bob-tailed" outline of the origin and development of equitable jurisdiction. For a comprehensive treatise upon the subject, see Spence, Equitable Jurisdiction of the Court of Chancery. See also, Story, Equity Jurisprudence (14th Ed.) Ch. II; 3 Black. Comm. §§ 46 et seq.; 1 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 1-42a.

must be one not recognized as existing by the law; or 2. The right existing at the law, the remedy must be one which the law cannot or does not administer at all; or 3. The right existing at the law, and the remedy being one which the law gives, the remedy *as administered by the law* must be inadequate, incomplete, or uncertain. Of these three alternatives, the first and second denote the exclusive jurisdiction of equity; the third, the concurrent jurisdiction."

And he points out further that the principle does not apply where a party has destroyed, lost or waived his right to an equitable remedy by his own actions, or lack of action.

It will be seen from what has been said above that it was the underlying and fundamental purpose of equitable jurisdiction to grant relief when, and only when, the law courts could not, or would not, render a complete and adequate remedy for the wrong done.

This brings us to a consideration of the relief granted in this case by the court below, namely, specific performance. It has been said that bills to specifically enforce contracts for the sale of land are among the earliest recorded in the Court of Chancery in England.[3] And Lord Chancellor Hardwicke, in the famous case of *Penn v. Lord Baltimore,* 1 Ves. Sr. 444, where Lord Baltimore lost an important and valuable tract of land included within the original boundaries of Maryland, declared that specific performance was the most useful of the various equitable remedies. But so much for the historical aspects of the remedy. Chief Judge Brune, in *Pollin v. Perkins,* 223 Md. 532, 544, 165 A. 2d 908, recently pointed out, as this Court had many times before, that where a contract for the sale of realty is fair, reasonable and certain, it is as much a matter of course for a court of equity to decree specific performance as it is for a court of law to award damages for its breach. We have indicated above that we think the contract is fair, reasonable and certain; hence the Chancellor was correct (for this reason alone) in granting the relief that he did.

---

3. 1 Spence, op. cit., § 645.

In addition, however, it seems apparent, upon merely a cursory analysis of the situation, that if the plaintiff be required to resort to condemnation proceedings, it would not receive such a full, adequate and complete a remedy as that of specific performance. True, the plaintiff could acquire title by condemnation, but a jury would be allowed to fix damages for the taking (a procedure much desired by the appellant), after the parties have already agreed between themselves as to the purchase price to be paid for the property to be conveyed. We, therefore, hold that the appellant has been unable to support her contentions under either I or II; hence the chancellor was correct in specifically enforcing the contract.

*Decree affirmed, with costs.*