686 A.2d 1113

**SHALLOW RUN LIMITED PARTNERSHIP**

v.

**STATE HIGHWAY ADMINISTRATION.**

No. 646, Sept. Term 1996.

Court of Special Appeals of Maryland.

Dec. 27, 1996.

Paul A. Hackner (Klos & Hackner, P.A., on the brief), Annapolis, for Appellant.

C. Robert Loskot, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for Appellee.

Argued before MOYLAN, WENNER and CATHELL, JJ.

CATHELL, Judge.

Shallow Run Limited Partnership, appellant, appeals from a judgment rendered by the Circuit Court for Howard County (Sweeney, J., presiding) directing the specific performance of a land acquisition contract in favor of the State Highway Administration, appellee (sometimes hereinafter referred to as the State or SHA). Appellant presents two questions, one with multiple parts:

1. Did the Circuit Court err by ordering specific performance of a contract in which a material term was vague and uncertain?

2. Did the Circuit Court err by granting specific performance of a contract for the purchase of property which the Appellee/contract purchaser had previously condemned:

A. Was the contract enforceable after the parties failed to settle within the three month deadline contained in the contract?

B. Did SHA's conduct constitute a waiver of its right to enforce the contract?

C. Was specific performance barred under the doctrine of judicial estoppel?

D. Would specific performance of the contract violate the statutory prohibition against abandonment of a condemnation after property is taken by SHA?

### The Facts

Appellee entered into negotiations with appellant for the purpose of acquiring 18.591 acres of a larger tract containing approximately 29.691 acres. The acquisition by the State of the 18.591–acre parcel apparently left the remaining parcel "land-locked," *i.e.*, without access to road frontage, at least for a temporary period. To address the status of the landlocked parcel, certain easement provisions were included in the sub-

sequent documentation, *i.e.*, the option or contract.[1] The option or contract contained provisions requiring appellant to settle within ten days[2] and to provide clear title to the State at that time. The contract also provided that the State could take immediate possession of the property. Other provisions required that the deal be consummated within ninety days.

The property was encumbered by mortgages exceeding the anticipated purchase price of the property, and, therefore, appellant was required to obtain a release of liens for the subject property. It was unable to do so within the ten-day period, and the parties continued to attempt to effectuate settlement. During this period, the subject of condemnation came up. The State alleges that it was in the context of a "friendly condemnation."[3] Appellant claims otherwise.

After the "quick take" condemnation[4] was instituted, the State deposited into court the amount of its appraisal of the subject property, which was $13,000 less than the amount

---

1. There was evidence that other road access might later occur as a result of future construction. If, and when, the future access occurred, the easement would terminate.

2. While the primary proponent of the ten-day period was appellant, the State was acquiring the subject property as wetland mitigation, as required by federal statute, relative to its construction of Route 100. Acquiring the property for wetland mitigation was important in that if not contractually provided for, federal grants for the construction of Route 100 could be delayed. Thus, prompt settlement was a desire of the State as well as appellant.

3. "Friendly condemnation" as explained by the State's witness, and as relative to the case *sub judice,* is used to convince lien holders or recalcitrant co-owners of property to negotiate more expeditiously. It is generally requested or agreed to by one or more of the entities who have an interest in the property.

4. A "quick take" condemnation occurs when the State deposits the acquisition price it proposes for the subject property into court and takes immediate possession of the property. The legal aspects of the condemnation, primarily the amount of the purchase price, is subsequently litigated. Provisions for quick take action are found in Section 40B of the Maryland Constitution, section 12–102 *et seq.* of the Real Property Article of the Maryland Code, and in Subtitle U of the Maryland Rules.

it had agreed to pay under the option contract. This appraisal was procedurally required. The condemnation action then continued.

The sums deposited were withdrawn by appellant and subsequently used, at least in part, to facilitate a release of the interests of the various lienholders. After appellant was able to provide clear title, the State requested that appellant fully perform pursuant to the terms of the contract option. Appellant refused and insisted that the contract had been terminated when the State filed the condemnation action and asserted further that the State was required to proceed and conclude its condemnation action. The State then instituted the instant case for specific performance of the option contract.

We shall further discuss the relevant facts as we address the respective questions.

### 1. The Easement Provision

■ Appellant asserts that the provisions in the option contract in respect to its retention of an ingress/egress easement to the "landlocked" property are so vague and uncertain as to make the entire agreement unenforceable. In its answer to the complaint below, appellant denied generally the allegations of the complaint but made no special answer claiming that the easement provision was vague and uncertain and that the contract was unenforceable for that reason. Appellant did assert the following special defenses:

11. Plaintiff's action is barred by laches.

12. Plaintiff has failed to state a claim upon which relief may be granted.

13. Plaintiff is precluded from this action by waiver.

14. Those who signed the Option Contract on behalf of Defendant, lacked the capacity and were without authority to bind Defendant.

15. Plaintiff is precluded from pursuing this claim because of a pending condemnation action which by law may not be dismissed.

On May 10, 1994, appellant filed a motion for summary judgment that, as relevant to this question, asserted: "The option contract ... should be disregarded as a matter of law for failure of express conditions precedent." In the affidavit in support of this motion, appellant asserted that the provision of an easement by the State was one of the conditions precedent[5] (as was the ten-day settlement period and the three-month delivery of deed and title period). The State opposed the granting of the motion for myriad reasons, including: "[P]aragraphs (D)(1) [the easement provision], (D)(2) [the ten-day settlement provision], and (E) [the three-month period for delivery of marketable title] are not conditions precedent...." The trial court denied appellant's summary judgment motion by written Memorandum and Order dated June 29, 1994. The court made no separate finding on the easement issue.

Ultimately, the trial court, in its final judgment, addressed the matter of the easement, as well as the other matters appellant claimed were conditions precedent.[6] It stated:

Shallow Run also argues that the contract contains conditions precedent which were not fulfilled and that, as a result, the contract is not enforceable. Shallow Run argues that those conditions required that (1) S.H.A. provide easement access to Shallow Run for ingress and egress to the rear parcel and front parcel; (2) that the State settle within ten (10) days of its acceptance of the Option, on the condition that Shallow Run provided good and marketable fee simple title to the front parcel; and (3) that Shallow Run deliver good and marketable fee simple title to S.H.A. within three months of acceptance of the Option.

As to the providing of an easement for egress and ingress, this was not a condition precedent. This obligation was an ongoing one to be effectuated by the State. There is

---

**5.** We fail to understand how the State, as a condition precedent, could provide an easement over land that appellant refused to convey to it.

**6.** We include its entire holding on the alleged conditions precedent at this point in our opinion and refer back to it as necessary when, and if, we discuss the other claimed conditions.

no indication that the State will not provide the easement needed in a timely fashion.

The ten-day provision is not a condition precedent, but was inserted at the request of Shallow Run's agents for Shallow Run's benefit. The ten-day provision was never viewed by Shallow Run prior to the filing of the instant litigation as a condition precedent. Indeed, Shallow Run's representatives were acting throughout the course of the pre-litigation history in full understanding that an enforceable contract existed. Shallow Run did have an obligation to deliver good and marketable fee simple title to S.H.A. within three months of acceptance of the Option. This was not a condition precedent to the contract's enforceability but an obligation that Shallow Run could not or would not comply with. It is just such an obligation that a specific performance action can seek to enforce.

It should also be noted that the time provisions in the contract were in many respects put into the contract more as goals than mandates. The actions of the parties to the contract prior to the initiation of the condemnation litigation demonstrate an intent to continue to work to fulfill the terms of the contract, regardless of the specific wording as to time limit. S.H.A. has consistently wanted to do this deal, and it appears that Shallow Run's representatives also did, at least from May to September, 1992. Even if the time provisions at issue were viewed differently, the actions of the parties clearly waived any time mandate that Shallow Run now relies on.

Laches in bringing this matter has been raised by Shallow Run. The Court rejects this. While S.H.A.'s approach to enforcing its rights under the contract was at times confused and haphazard, the Court does not believe that there has been any inequitable delay or substantial prejudice to Shallow Run from S.H.A.'s somewhat plodding efforts to enforce its rather clear contract rights.

The trial court found that the easement provision, as stated in the contract, was not intended to be a condition precedent to settlement but rather a continuing obligation of the State.

We agree. Moreover, there was evidence that the parties knew of the initial proposed location of the easement and that the State had the right to change that location. Mr. Gorsuch, an employee of the State Highway Administration and "team leader" for the Western Region (team leaders were previously called Assistant Chiefs of Right of Way),[7] testified that he initially had a conversation with a contract purchaser of the Shallow Run property, Mr. Bean.[8] In his initial discussion with Mr. Bean, the subject of easement access to the "landlocked" parcel came up. Mr. Gorsuch

> told him [Mr. Bean, that] I thought there wouldn't be a problem getting an easement, I would have to get a plat prepared to show where we would probably allow an easement to be. . . .
>
> . . . .
>
> . . . I told him that I thought we could get an ingress and egress easement over that property. . . .
>
> . . . .
>
> Q. What does ingress and egress mean to you?
>
> . . . .
>
> A. They could put a driveway, whatever they needed, for access to the rear property. . . . I specifically put in for an eighty foot wide easement. . . .

Mr. Gorsuch then discussed the initial conversation he had with Mr. Stultz, president and general partner of appellant, prior to setting up the meeting between appellant and himself: "He questioned me about the easement. . . . I told him there would be an easement and that I would have a plat attached to the option contract showing the easement area." Later, Mr. Gorsuch was asked:

---

**7.** Mr. Gorsuch testified that team leaders supervise negotiations, negotiate with potential sellers of property, manage property, and acquire properties.

**8.** Mr. Bean later sat in on discussions and the consummation of the contract with appellant and the State. There is some indication that the State compensated him separately for his interest in the property.

Q. ...Were you ever asked by ... [appellant] to provide an easement that was developed, that was graded, that was paved, that was improved in any way?

A. I was not asked to provide that ... and I emphatically stated we would not provide or construct a bridge or a road for that.

He then testified that he obtained the option document and then attached to it "the plat delineating the eighty foot easement." He testified that that plat was attached to the contract when it was executed by appellant and that Mr. Knott, another of appellant's principals, initialed the plat in the lower right-hand corner. There are initials on the lower right-hand corner that appear to be those of Mr. Knott. That plat clearly shows an 80–foot–wide, 1,579.11–foot–long easement along the western and southern boundaries of the subject property. Mr. Gorsuch testified that he showed Mr. Stultz and Mr. Knott the plat: "I gave them [Mr. Stultz and Mr. Knott] the contract—each one [had] a copy of it to read, and we discussed the easement. I showed them the easement area on the plat." On cross-examination, he testified further about the easement and the State's modification rights:

A. I believe it said in the contract that this could be moved ... or subject to relocation....

. . . .

Q. In other words, ... [the plat] you were showing to Mr. Stultz and Mr. Knott was one person's idea of where ... but somebody else in your department could decide that it wouldn't go there ... ?

A. I believe that's correct.

Mr. Bean testified that he discussed with appellant the discussions he had with the State regarding the easement issue. He stated: "I probably told them that I had asked and tried to get the State to build ... a structure across the stream and was unsuccessful and basically telling them, I guess, they still had the right to try and get that but I was not successful...." Mr. Knott, a limited partner of appellant, testified that appellant had told appellee during negotiations

that "we still needed access to the back piece of property.... [W]e [he and Mr. Gorsuch] discussed the access and various items in the access." Mr. Knott was asked:

> Q. ...[D]id you discuss with him specifically where the access would be ... ?
>
> ....
>
> A. He [Gorsuch] showed us ... a drawing showing where ... the possible access could have been.... [H]e said, "Well, your right-of-way could go here, but we could move it according to what your needs were."[9]

Later, Mr. Knott described further his understanding "that road was a temporary road, because once the people developed the piece of property in the back, we had to bring another road in.... We couldn't spend a lot of money on putting a temporary road of two years ... that was a key in that negotiation." (Emphasis added.)

The easement language in the option agreement provides that the State would provide an ingress/egress easement to the landlocked parcel and that the

> easement [would] be extinguished at the end of two (2) years or at such time as physical and legal access becomes available through Parcel 285 ... whichever shall occur last. The said easement delineated on a property plan attached hereto is subject to modification based upon the State Highway Administration's final wetlands mitigation design.

This language, in the first instance, is not vague and uncertain. It is clear the State is required to grant the 80–foot-wide by 1579.11–foot–long easement delineated on the plan attached to the contract. The State is permitted to change the location of that easement depending upon its final plans for the property. It is apparent from the evidence that all parties knew that to be the case. Appellant may not like it, and may not have liked it even when it agreed to it, but it did agree. The contract is clear—what may be uncertain is the

---

9. There were other discussions relating to the costs of a road and bridge that do not concern the issue of vagueness now being asserted.

end result, *i.e.*, the precise location of the easement. But it is certain that appellant will get an easement. In that regard, we note what the Court of Appeals stated in *Sibbel v. Fitch,* 182 Md. 323, 327, 34 A.2d 773 (1943) (quoting 28 C.J.S., *Easements* § 82):

"Where an easement in land, such as a way, is granted in general terms, without giving definite location and description of it, the location may be subsequently fixed by an express agreement of the parties, or by an implied agreement arising out of the use of a particular way by the grantee and acquiescence on the part of the grantor, provided the way is located within the boundaries of the land over which the right is granted. As otherwise expressed, it is a familiar rule, that, when a right of way is granted without defined limits, the practical location and use of such way by the grantee under his deed acquiesced in for a long time by the grantor will operate to fix the location. The location thus determined will have the same legal effect as though it had been fully described by the terms of the grant."

. . . .

... [T]he same principles with reference to the location of a way of necessity and the location of a way reserved in general terms are applicable.

In the case *sub judice*, the State reserved the right to relocate the easement. The Court, in *Sibbel,* noted "the location of an easement when once established cannot be changed by either party without the other's consent *except* under the authority of a grant or reservation to this effect." *Id.* at 328, 34 A.2d 773 (emphasis added). In the case at bar, the easement was definitely fixed at the time of the signing of the contract—and there was ample evidence that appellant knew that its location was fixed. Moreover, the contract, in clear and certain terms, reserved to the State the power to modify that easement. Modifications, if any, must be reasonable. We stated in *Drolsum v. Luzuriaga,* 93 Md.App. 1, 17, 611 A.2d 116, *cert. denied,* 328 Md. 237, 614 A.2d 83 (1992) (quoting *Bishields v. Campbell,* 200 Md. 622, 624–25, 91 A.2d 922 (1952)):

[A] right of way is merely a right of passage and the owner of land is entitled to use it for any purpose that does not unreasonably interfere with the use of the easement. Hence, it is held in this State that, in the absence of an agreement or surrounding circumstances to the contrary, the owner of the servient estate has the right to maintain gates on a right of way at the points where the way begins and terminates. Of course, if a grant, construed in connection with the surrounding circumstances, shows an intention that no gate shall be erected, such a showing of intention is controlling. It is equally true that the fact that a gate was standing at the time of a grant is a circumstance that strengthens the presumption that the parties contemplated that a gate might thereafter be maintained.

We noted in *Drolsum* that a servient owner's (the State here) modification of an easement must be reasonable. We also noted the law regarding the construction of improvements in the easement area and repairs to those improvements:

In the absence of an agreement, the owner of the servient tenement is under no duty to maintain or repair it, but rather it is the duty of the owner of the easement to keep it in repair. 25 Am.Jur.2d § 85. The few Maryland cases on this subject hold that an easement owner has a *right* to repair, maintain, and improve the easement. We believe that no Maryland case has actually considered the duty of an owner to keep an easement in repair. See *Wagner v. Doehring*, 315 Md. 97, 104 [553 A.2d 684] (1989) (grant of right of way entitles holder to "maintain, improve, or repair the way to serve its purpose"); *Tong v. Feldman*, 152 Md. 398, 402 [136 A. 822] (1927) (dominant tenement owner may enter, at reasonable times, to make proper repairs); *Fedder v. Component Structures Corp.*, 23 Md.App. 375, 381 [329 A.2d 56] (1974) (owner of right of way may prepare, maintain, improve, or repair way).

*Id.* at 20, 611 A.2d 116.

In a negligence case, *Wagner v. Doehring*, 315 Md. 97, 104–05, 553 A.2d 684 (1989), the Court of Appeals held that a

holder of an easement has the limited liability against a trespasser that the owner of the fee might have so long as the easement holder has asserted control over the easement. The Court commented, "[t]he grant of a right-of-way ... entitle[s] the holder to ... improve, or repair the way to serve its purpose." *Id.* at 104, 553 A.2d 684. The Court ultimately held:

> We ... hold that the holder of an easement for ingress and egress is afforded the same protection to which a landowner is entitled with respect to a trespasser, when the easement holder exercises a degree of control over the land which permits the holder to exclude trespassers from the easement. This is consistent with the rationale that a possessor of land should be free to use his land without the burden of watching for and protecting it against trespassers. See W. Prosser, [*The Law of Torts*] § 58; see also 5 F. Harper, F. James & O. Gray, The Law of Torts § 27.2, at 136 (2d ed.1986) (if the source of a landowner's immunity is that he is not charged with knowledge of a trespasser's presence, then the same immunity should be applied to the holder of an easement).

*Id.* at 107, 553 A.2d 684. Although Wagner was a negligence case, it reaffirms the principle that holders of easements, such as appellant would be here, have the power to construct improvements to the easement reasonably necessary for all permitted uses of the landlocked parcel.[10]

■ What the law contemplates when the grantor of a defined easement reserves the power to modify it are those constraints that exist in the case of easements by necessity. "The test in such cases is the question of a *reasonable access* to the property of the party claiming to be entitled to a way of necessity." *Beck v. Mangels,* 100 Md.App. 144, 168, 640 A.2d

---

**10.** The parties often refer to this parcel as the back parcel. We have used "landlocked" because all landlocked parcels are landlocked but not all "back parcels" are. The agreement contemplates that, in the future, this parcel may not be landlocked even though it will still be the back parcel.

236 (1994) (quoting *Zimmerman v. Cockey,* 118 Md. 491, 496, 84 A. 743 (1912)), *cert. dismissed,* 337 Md. 580, 655 A.2d 370 (1995).

Thus, we conclude that the easement provision in the contract is not vague and uncertain.   It established the then present location of the easement and reserved to the State the right to reasonable modification, *i.e.,* relocation.   Moreover, we also hold that the mere grant of a simple easement permits the dominant holder (appellant) to improve, maintain, and repair the easement area consistent with its needs, and permits it to use that area, wherever located, without unreasonable interference from the servient owner (here the State) and does not require the servient owner to construct or maintain improvements in the easement area unless the grant itself requires it.

Finally, we hold, with our above resolution, that it is unnecessary for us to determine whether the easement provision was a condition precedent.   If it was a condition precedent, that condition was met when the State executed the contract with the plat attached.   That is all, at that stage, that the State could do because appellant thereafter was initially unable and then refused to settle and thus declined to execute a deed reserving to itself the easement in question or requiring, at settlement, that the State grant it an easement under separate document.

Appellant contends that the language of the easement

leaves the Appellant completely uncertain whether its property can be developed, and if so, to what extent it can be developed, when it can be developed, what the uses of the property can be, what the cost of development will be and whether there are environmental or other regulatory obstacles to building an entrance roadway.   Since the Bradshaw parcel is an industrial zoned property, the value of the property is directly proportional to its development potential.   [Footnote omitted.]

All of these potential problems are, if they occur, the result of the clear and certain terms of the contract.   These

problems were, or should have been, *clearly* discernable when the easement provision was negotiated and the contract executed. In summation, appellant chose to enter into a contract that clearly created potential problems in respect to their use of the remainder of the property. If the contract was bad for appellant and if appellant's use of the remainder of their property is limited as a result of the contract—so what? People are permitted to enter into contracts to their disadvantage. If appellant had contracted to landlock the remainder of its property completely, it could have done so. We noted in *Beck*, 100 Md.App. at 158, 640 A.2d 236 (quoting *Dalton v. Real Estate & Improvement Co.*, 201 Md. 34, 46–47, 92 A.2d 585 (1952)):

> A distinction has been maintained in the law between implied grants [where a grantee is granted landlocked property] and implied reservations [where a grantor retains landlocked property].... [I]f a grantor intends to reserve any rights ... he must reserve them expressly, and the only exception is of easements ... of ... strict necessity....

We later noted in *Beck* a statement from *Hancock v. Henderson*, 236 Md. 98, 102, 202 A.2d 599 (1964), "The rule with respect to implied reservations is much more strict than that with respect to implied grants." 100 Md.App. at 159, 640 A.2d 236. Thus, if appellant wished to reserve any additional easement rights over the property for the benefit of the property retained, it should have retained an express reservation of such additional rights.

Appellant's briefed argument on question one is based entirely on the easement provision. Accordingly, we do not address whether any other terms were vague and uncertain. The circuit court did not err in its treatment of this question.

## 2. Granting of Specific Performance

Appellant argues that the trial court erred in granting specific performance. Appellant presents multiple questions with respect to this argument. We address appellant's first two questions together.

**A. Was the contract enforceable after the parties failed to settle within the three month deadline contained in the contract?**

**B. Did SHA's conduct constitute a waiver of its right to enforce the contract?**

In reviewing the trial court's factual findings relating to the questions at issue, we are concerned with whether the trial court was clearly erroneous. We noted in the criminal case of *Nixon v. State*, 96 Md.App. 485, 491–92, 625 A.2d 404, *cert. denied*, 332 Md. 454, 632 A.2d 151 (1993):

The standard of review for court trials is well-established. Maryland Rule 8–131(c) provides that in an action tried without a jury, an appellate court "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *See also Reisterstown Plaza Assocs. v. General Nutrition Ctr., Inc.*, 89 Md.App. 232, 240 [597 A.2d 1049] (1991). "Unless the factual findings of the trial court are clearly erroneous, an appellate court may not arrive at different factual conclusions. If there is any competent material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous."

In *Emory v. State*, 101 Md.App. 585, 622, 647 A.2d 1243 (1994), *cert. denied*, 337 Md. 90, 651 A.2d 855 (1995), we said:

Because the weighing of evidence is the exclusive prerogative of the fact finder and does not impact on the purely legal question of whether some competent evidence is present to support a finding, evidence that is legally sufficient to satisfy one burden of persuasion is legally sufficient to satisfy any burden of persuasion. This is the "clearly erroneous" standard of appellate review. It was explicitly spelled out by *State v. Faulkner*, 314 Md. [630, 635, 552 A.2d 896 (1989) ]....

We also restated the "clearly erroneous" standard in our recent civil case of *Mayor of Rockville v. Walker*, 100 Md.App. 240, 256, 640 A.2d 751, *cert. granted*, 336 Md. 354, 648 A.2d 464 (1994):

It is hornbook law, memorialized in Md. Rule 8–131(c), that "[w]hen an action has been tried without a jury, the appellate court ... will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of witnesses." This means that if, considering "the evidence produced at trial in a light most favorable to the prevailing party ...," there is evidence to support the trial court's determination, it will not be disturbed on appeal. *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 41, 382 A.2d 564 (1978). Moreover, "if there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous." *Staley v. Staley*, 25 Md.App. 99, 110, 335 A.2d 114, *cert. denied*, 275 Md. 755 (1975).

▮▮▮ Mr. Gorsuch testified that in his initial contact with appellant, which was prior to presenting appellant with a contract, Mr. Stultz

also asked me how fast we could settle, and I said that would be entirely up to him. He requested that we settle within ten days.

Q. And did he tell you why?

A. At that time I believe that's when he told me that they were very close to being foreclosed on ... and that they wanted to get this completed as soon as possible.

Later, he testified that "Mr. Stultz in particular [told him] that there would be no problem, they could clear the property within this ten-day period.... [T]hey ... asked for the check to be delivered within ten days." Later, he explained the delays in the settlement process were at the request of appellant. He noted that Mr. Stultz asked him to withhold notifying tenants. Mr. Gorsuch explained that Stultz:

At that time ... was having problems getting a clear title to the property, and he asked for more time.... I believe during one of our conversations when he indicated he was having problems getting the clear title, he asked if there was any way that we could assist in that. And at that time

I think I indicated, "Well, we have done friendly impositions in the past...."

....

A. Excuse me ... [.] Friendly condemnations in the past where it was difficult to get all property owners or lien holders to agree and that we could file what we refer to as "a friendly condemnation."

....

THE COURT: It gives you leverage over the lien holders, right?

A. Yes, right....

....

Q. ...What was the purpose of offering a friendly condemnation ... to Mr. Stultz when he asked if there was anything else that we could do?

....

A. I was attempting to assist them in any way I could to help them clear the property....

....

... Clear it of ... anybody who has interest in the property. Lien holders....

....

Q. Now, when you mentioned this friendly condemnation possibility to Mr. Stultz, what was his response?

A. He questioned me as to what that meant....

....

... I don't recall what his response was...."

On cross-examination, he reiterated that Mr. Stultz wanted the ten-day settlement provision and, in response to a question, testified additionally to Mr. Stultz's knowledge of "friendly condemnation":

I said I recall telephone conversations with Mr. Stultz.... At the time he was telling me he was having problems getting the title cleared as fast as he thought he could and conversation such as he was very—what's the word I'm

looking for—he was very anxious. He even told me that his house was up for mortgage on this property, he could lose everything ... [.] He wanted to know if there was any way that we could assist in getting this cleared up. And I think that's when I suggested that it was possible that we might be able to go with a friendly condemnation at which time he asked me what that meant.

Mr. Gorsuch concluded by noting that Mr. Stultz's "big concerns were the easement and the ten[-]day turn around."

Ms. Kimmel, a Contractual Right–of–Way Supervisor for the State, was assigned by Mr. Ditto, the Deputy Director of the Office of Real Estate, to do the settlement. During her direct examination, the following colloquy took place:

Q.  ... From the State's point of view, was the State ready, willing and able to proceed to settlement within the ten days except for being provided with the releases of liens by Mr. Stultz.

A.  ... [W]e found out ... that ... the general partner ... [was] not in good standing....

Q.  Did he correct that?

A.  Yes....

Q.  ... [W]as the State ready, willing and able to proceed to settlement within the ten[-]day period?

A.  Yes, it was.

She testified that it was Mr. Stultz's responsibility to obtain the release of liens. She said that they were unable to proceed to settlement because appellant could not get the releases but that if the releases had been provided, the State was ready to proceed.

Mr. Kral, the Chief of the Special Acquisition Section of the Office of Real Estate in charge of wetland mitigation acquisitions, subsequently became involved in the transaction. He noted that Ms. Kimmel had come to him and told him that the State was ready to settle but that appellant could not produce the lien releases. He stated that he discussed the difficulty with his supervisor, Mr. Finck, and that they decided initially

to wait [11] and see if appellant could, given sufficient time, obtain the releases. That decision was communicated to appellant on at least "twenty" occasions. He then testified:

> Along about late July and August, after talking to Mr. Stultz and Mr. Knott numerous times, they began questioning me on whether the State would file a friendly condemnation in order to get the money posted in court and hopefully therefore satisfy the liens and somehow divide up the money so the releases could be signed.
>
> Q. And what was the result of these conversations?
>
> A. I discussed their request—Mr. Stultz'[s] and Mr. Knott's requests for us, State Highway, to file a friendly condemnation—with Mr. Finck, my boss; and, after a while, we agreed that we would file a friendly condemnation in order to hopefully get Shallow Run to be able to satisfy their liens.

Mr. Kral then explained that he had obtained an appraisal that was required by law in order to be able to proceed with the friendly condemnation. He then testified:

> Q. And, as a matter of fact, on August 17th of 1992, according to your note here, you talked to Mr. Stultz, and you told him at that time that you would file a friendly condemnation proceeding to clear the title. Did you not, sir?
>
> A. That's because prior to that he requested that we file a friendly condemnation.
>
> . . . .
>
> A. This was in a phone conversation. And at one time Mr. Schultz[12] and Mr. Stultz both showed up at my office, and we discussed it.

---

11. Under a provision in the agreement not directly relevant, or at issue here, the State was able to take possession of the premises during the various proceedings.

12. This Mr. Schultz is not involved in this case other than that he and his wife were lien holders.

Mr. Finck was subsequently asked why the condemnation was initiated and responded that "[t]he purpose was to clear title to the property." He was later asked:

Q. ... You indicated your policy is that you would only file a condemnation in a case of a wetland mitigation acquisition if it was friendly.

A. Yes.

Q. If you had any indication that either of the Shallow Run partners opposed the acquisition, would you have made your presentation and recommendation to the State Roads Commission as you did?

. . . .

A. ... Likely as not, I would not have made a recommendation to the State Roads Commission.

The trial court, in its Memorandum and Order, opined:

This Court does not believe that, in the context of the facts presented here, the State's filing of the condemnation action acted as a bar to its pursuing the remedy of specific performance. Shallow Run's representatives had run into problems obtaining releases of liens by First American Bank and the Schultz's, who held mortgages on the property. It became clear to the parties to the May 28, 1992[,] contract that settling on the contract by way of a clear title was problematic and going to be time-consuming. The State, under appropriate procedures and with the understanding of Shallow Run's agents, entered the property to begin its mitigation activity.

An internal document of the State Highway Administration ("S.H.A.") indicates that S.H.A. proceeded with the condemnation in the Fall of 1992 for the reasons it stated therein:

Please be advised that the wetlands acquisition section is filing friendly condemnation against Shallow Run Limited Partnership in order to clear title.

Shallow Run's representatives have denied they had any knowledge in August, 1992, or prior to the filing of such an action, about any such "friendly condemnation" proceedings

and deny that they agreed to such a process or waived any rights they had.

The Court believes that S.H.A.'s representatives were proceeding with the condemnation as a method to aid in the removal of the obstacles to the enforcement of the contract. The Court does not find that S.H.A. abandoned or waived its rights under the contract, but instead was attempting to implement it. Shallow Run's intentions are somewhat more murky. It appears that Shallow Run's initial intention to work to effectuate the May 1992 contract eventually evolved into an understanding that Shallow Run's interests might be better served by letting the S.H.A. take whatever action it deemed necessary, with the hope that Shallow Run's leverage would be increased to actually make more money from this transaction. While it would have been prudent for S.H.A. to obtain Shallow Run's specific written acquiescence in the friendly condemnation suit, the Court does not find such failure to be fatal to its rights to enforce the contract in the specific facts presented here.

That evidence we have discussed herein supports the trial judge's finding that the State did not engage in any conduct that would constitute a waiver. Moreover, Mr. Finck testified specifically, without contradiction, regarding the boilerplate language of the contract that required appellant to deliver good and marketable title within three months. He stated:

Q. Do you see the reference to a three month time period?

A. Yes, I do.

Q. Do you know what the basis for that three month time period is?

. . . .

Q. ... [D]oes the State ... hold hard and fast to the three month time frame?

. . . .

A. ... Our policy generally, as a matter of practice, is that we will try, in a reasonable amount of time, to complete the transaction with every property owner; and in any

instance where a property owner is having some difficulty meeting the requirements of the contract, we generally are very flexible and will allow additional time.

We hold that the evidence supports a finding that the condemnation proceeding was instituted, if not at the request of, at least with the approval of appellant. The delays that caused the ten-day period and the three-month period to be passed were occasioned by the State's desire to accommodate appellant. What occurred during the delays was with the approval of appellant.

**C.  Was specific performance barred under the doctrine of judicial estoppel?**

■■ We have examined the record below. We cannot find, nor did appellant indicate, where the issue of judicial estoppel was raised in the trial. Accordingly, the issue is not preserved for our review. *See* Md. Rule 8–131. We shall not address it.

**D.  Would specific performance of the contract violate the statutory prohibition against abandonment of a condemnation after property is taken by SHA?**

■■ Real Property Article section 12–109 provides that no condemnation proceeding may be abandoned after a taking has occurred. It is clear that there was sufficient evidence supporting the conclusion that a friendly condemnation was initiated in order to assist appellant in obtaining a release of liens. The appraised price was deposited by the State in court as required by law, then withdrawn by appellant as permitted by law, and then utilized by it. Even prior to the condemnation suit, the State had taken possession of the premises pursuant to a provision in the contract.[13]

---

13.  Clause (G) of the contract provided:

   IT IS HEREBY FURTHER UNDERSTOOD AND AGREED THAT THE "GRANTEE" [State], . . . may enter in and upon the hereinbefore described premises and proceed with the construction of the said State Road and/or Bridge and their appurtenances, immediately upon the mailing by the "GRANTEE" to the hereinafter specified Grantor

The condemnation suit apparently is still pending. In any event, there has been no motion by the State to dismiss it nor has there been any formal abandonment. The State asserts that the condemnation case, by reason of the judgment in the case, is, or will be, moot. Appellant apparently argues that what has happened here is a constructive abandonment. Both parties agree that there is no prior Maryland case addressing whether a suit for specific performance may be maintained at the same time a condemnation suit is pending and whether what has occurred here constitutes an unauthorized abandonment of a condemnation case.[14]

The trial court stated this issue somewhat differently in its examination of this case:

The question remains, however, as to whether, despite the intentions of the parties, the filing of the condemnation action, as a matter of law, bars the remedy of specific performance of a contract that was purported to exist prior to the filing of the action. The Court does not believe that it does so. While there is no Maryland case directly on point, the Court is persuaded by the authority cited by the S.H.A., especially the cases of *Colaluca v. Ives*, [150 Conn. 521] 191 A.2d 340 (Conn.1963) and *De[L]ucia v. Burns*, 11 Conn.App. 439, 527 A.2d 1234 (1987).

It would frustrate the public interest to allow a landowner who is either unwilling or unable to fulfil his contract with the state for the purchase of land to either require the State to seek to enforce its contract or proceed by condemnation. At times, parallel proceedings may be necessary to effectuate the public good. This Court discerns no authority in case law or statute that would, under the facts presented here, bar the State from using the condemnation process

---

or Agent by registered mail of a notice of the acceptance of this option by the "GRANTEE."

14. This may not be completely accurate. *Manning v. Potomac Elec. Power Co.*, 230 Md. 415, 187 A.2d 468 (1963), cited by both parties, which we shall hereafter discuss, appears to be helpful, albeit at times in *dicta*.

without abandoning the claim that it has a contract enforceable at law. To hold otherwise would invite every contract seller of land to the State for a vitally needed project to delay and drag its feet in the hope of either obtaining a better deal or forcing the State to condemnation and abandonment of the State's contract rights.

The Court does not hold that the filing of a condemnation action by the State can never bar it from attempting to enforce a contract, and there will undoubtedly be situations where such State action would in fact be an election[15] and operate as a bar to a contract enforcement action. But under the unique facts presented here, the Court does not find that a legal barrier exists to pursuing such an action.

Shallow Run creatively argues that giving S.H.A. relief in the specific performance action would make unnecessary the condemnation action instituted in Case No. 92–CA–20471, and such result would constitute an abandonment of a condemnation action prohibited by § 12–109(d)(1) of Md. Real Prop.Code Ann. Thus, it would be illegal, in Shallow Run's view. Shallow Run, however, misreads the law. S.H.A. is not "abandoning" the condemnation action. It is continuing it and will undoubtedly pursue it if S.H.A. does not succeed in this action. The fact that relief in the specific performance action will moot the condemnation case does not constitute S.H.A.'s "abandonment" as defined by § 12–109(d)(1).

Appellant, in its brief, relies completely on the statute and its position that what has occurred either has resulted, or will result, in an abandonment. The State relies on the two

---

15. "To compel a litigant to select among his remedies frequently is onerous. This makes the doctrine [of election of remedies] a severe one and a court should not strain to employ it or seek to extend lightly its applicability." *Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 269 Md. 291, 299, 305 A.2d 465 (1973); *see also Surratts Assocs. v. Prince George's County*, 286 Md. 555, 567–68, 408 A.2d 1323 (1979). "The purpose of the doctrine ... is ... to prevent double redress for a single wrong." *Herring v. Citizens Bank & Trust Co.*, 21 Md.App. 517, 543, 321 A.2d 182, cert. denied, 272 Md. 742 (1974); *see also DeLucia v. Burns*, 11 Conn.App. 439, 527 A.2d 1234, 1238 (1987).

Connecticut cases, which were mentioned by the trial court: *DeLucia v. Burns,* 11 Conn.App. 439, 527 A.2d 1234 (1987) and *Colaluca v. Ives,* 150 Conn. 521, 191 A.2d 340 (1963). We shall first examine these two cases.

In *DeLucia v. Burns, supra,* the landowner, as did appellant in the case *sub judice,* entered into a contract with the Commissioner of Transportation. At the settlement date, the landowner refused to go through with the transaction because he considered the agreed-upon purchase price to be inadequate. The Commissioner, as did appellee in the instant case, "needed possession ... to prevent delays in the highway construction project." *DeLucia,* 527 A.2d at 1235. The Commissioner filed a condemnation proceeding and deposited an amount equal to the previously agreed upon purchase price with the clerk of court, and, as occurred here, the property owner withdrew the sum. The landowner, alleging that the price was inadequate, appealed pursuant to a Connecticut statute.

The appellate court initially noted that the trial court had found that the initial agreement was a valid purchase and sales agreement. The court, after extensively addressing the earlier case of *Colaluca v. Ives, supra,* held:

Like the plaintiff in *Colaluca v. Ives, supra,* the plaintiff here was bound by a contractual agreement to convey a parcel to the highway commissioner for a fixed sum. Because of this agreement, his damages were limited to the amount of the contract "since that was the full value of [his] interest in the property at the time of the claimed taking.... Any greater sum would be, not just compensation, but an unwarranted gift of public funds to a private individual."

The plaintiff claims that when the commissioner chose to condemn the land pursuant to General Statutes § 13a–73(b) rather than institute a suit for specific performance to enforce the sales contract, he made an election of remedies that precluded him from asserting any rights he may have had in the property under the sales contract. We note that

this claim is inconsistent with the reasoning of the Supreme Court in *Colaluca v. Ives, supra.* There, the Supreme Court ruled that in a condemnation proceeding, the plaintiff's interest in land under contract to the state was limited to the price of the contract. Implicit in this reasoning is the conclusion that the state does not waive or abandon its contractual rights in a parcel merely by instituting a condemnation action for that parcel.

*Id.* at 1237–38 (citation omitted).

The earlier Connecticut case of *Colaluca v. Ives,* 150 Conn. 521, 191 A.2d 340 (1963) contained a factual situation even more similar to the facts of the instant case. Ms. Colaluca owned a restaurant in the line of a proposed highway. She had acquired the property from the City of Hartford. The deed from the city to her contained an option provision in favor of Hartford and/or the State of Connecticut that permitted them to repurchase the property at any time within twenty years for $35,000.

The highway commissioner first filed a condemnation suit to condemn the property and appraised ("assessed the plaintiff's damages") at $35,000. Ms. Colaluca appealed on the grounds that the amount was insufficient. The Commissioner filed a suit for specific performance. Ms. Colaluca contended that the condemnation suit could not be discontinued. Both the condemnation case and the suit for specific performance were tried together.

Among other issues raised by Ms. Colaluca was a very similar issue to the current assertion by appellant here that the condemnation could not be abandoned:

The plaintiff claims that the commissioner could not withdraw the condemnation proceeding because, under General Statutes § 13–145, the "taking" of the property was complete upon the filing of the certificate, the rights of both parties thereupon became vested, and discontinuance was thereafter barred as a matter of law. In other words, the plaintiff claims that when the "taking" was complete, which she claims was at the moment of the filing of the certificate,

she had a full right to damages under the condemnation procedure, pursuant to the rule of cases such as *Bohannan v. Stamford,* 80 Conn. 107, 109, 67 A. 372.

*Id.* 191 A.2d at 343. The Connecticut court opined:

It is important to note that there was never any abandonment by the commissioner of efforts to acquire the land in question for highway purposes. The plaintiff was not left with land on her hands which she supposed had been finally condemned. The only abandonment in this case, if it can be said that there was any, was the abandonment of the procedure of condemnation for that of acquisition under the option covenant in the deed.

*Id.* The court then made an assumption for the purposes of the opinion:

We may assume, without deciding, that the filing of the certificate by the commissioner constituted a "taking" of the property which not only disabled him from abandoning its acquisition by condemnation but also gave the plaintiff a right, protected by the constitution, to receive just damages.

*Id.* at 343–44. The court then decided the case primarily on the grounds of the damages to which Colaluca would be entitled. The court noted that "[h]ad the property not been 'taken' under the condemnation procedure," Colaluca would have been required to accept the option amount of $35,000. Because the agreement requiring her to convey the property to the Commissioner for $35,000 existed, that was, as between her and the Commissioner, the extent of her interest in the property at the time of the condemnation taking. Her damages in the condemnation suit, therefore, were limited to the amount she was required to and had agreed to accept pursuant to the contract. The court further explained:

Even if the trial court was technically in error in allowing the withdrawal of the condemnation certificate and the abandonment of the condemnation proceedings, the error was harmless, since the plaintiff, under the specific performance action, was required to do only what she was equitably obligated to do, and she received the full amount which

she could equitably have obtained under the condemnation proceeding had it been pursued. . . .

We note that there is authority contrary to the position taken by the Connecticut courts. In *Hilton v. Haleyville Hous. Auth.*, 288 Ala. 297, 260 So.2d 382 (1972), the Haleyville Housing Authority (Haleyville) and Hilton entered into an agreement for it to purchase Hilton's property for $25,000. When Hilton refused to consummate the agreement, alleging that it contained (by mutual mistake) an erroneous property description, Haleyville initiated a condemnation proceeding. Unlike the instant case where the condemnation action laid dormant, a final decree condemning the property and assessing a price of $37,500 was granted. Haleyville paid the sum into court and gave notice of appeal.

The condemnation action was pending when Haleyville sought a declaratory judgment that its contract with Hilton should be enforced at the contract sum. Hilton argued that Haleyville had waived its right to prosecute the specific performance action because Haleyville had filed the condemnation proceeding and, thus, had an adequate remedy at law. Haleyville argued that even though the condemnation case was then pending on appeal, Hilton was still bound by the offer to sell for $25,000 and was not "entitled to have such matters independently determined in the condemnation action now pending." *Id.* 260 So.2d at 384–85.

The Supreme Court of Alabama noted that "[c]learly, [Haleyville] is undertaking to substitute the instant proceeding for the condemnation proceeding to determine the amount due respondents for their land." *Id.* at 385. The court held on equitable grounds that Haleyville was not entitled to maintain the declaratory judgment action. See also *Redevelopment Auth. v. Gallagher*, 28 Pa.Cmwlth. 645, 370 A.2d 395, 396 (1977) (holding that the government entity could not specifically enforce an agreement between it and the landowner because it had obtained legal title to the property via an eminent domain proceeding).

*Hilton* is distinguishable from the case *sub judice.* In *Hilton,* Haleyville took possession of the premises solely under the condemnation. In the case *sub judice,* the State initially took possession of the premises under the contract and only filed the "friendly" condemnation suit in order to help appellant clear title to the property. In *Hilton,* the public body, solely for its own purposes, instituted condemnation proceedings. Here, the condemnation proceeding was initiated either at appellant's request or with its approval in order to facilitate appellant's efforts to provide appellee with clear title—*i.e.,* to perform its contractual obligations.

Our reading of *Manning v. Potomac Elec. Power Co.,* 230 Md. 415, 187 A.2d 468 (1963), strengthens our perception that the better course for Maryland is to follow the guidance of the *DeLucia* and *Colaluca* cases. In *Manning,* the public utility had the right of eminent domain. The Court of Appeals framed the property owner's issue of the alleged conflict between the condemnation power and the rights of a contract purchaser.

> This contention is a rather unusual one. If appellant's [the property owner's] version thereof is to be sustained, it requires a holding to the effect that the doors of courts of equity are closed to any contract-purchaser of real property, which has the power of eminent domain, and such contract-purchaser must resort to a condemnation proceeding to acquire title to the real estate involved.

*Id.* at 420, 187 A.2d 468. This is, in essence, the position taken by appellant in the case at bar.

The Court continued: "Such a ruling would defeat one of the fundamental and original reasons for equitable relief, especially that of specific performance. . . ." *Id.* After a brief discussion and evaluation of equity jurisprudence and a discussion of matters for which adequate remedies at law did not exist, the Court concluded its jurisprudential discussion by stating, "[I]t was the underlying and fundamental purpose of equitable jurisdiction to grant relief when, and only when, the

law courts could not, or would not, render a complete ... remedy.·...." The Court held ultimately:

> But so much for the historical aspects of the remedy. Chief Judge Brune, in *Pollin v. Perkins*, 223 Md. 532, 544 [165 A.2d 908 (1960)] recently pointed out ... that where a contract for the sale of realty is fair, reasonable and certain, it is as much a matter of course for a court of equity to decree specific performance as it is for a court of law to award damages for its breach.... In addition, however, it seems apparent, upon merely a cursory analysis ... that if the plaintiff be required to resort to condemnation proceedings, it would not receive such a full, adequate and complete a remedy as that of specific performance. True, the plaintiff could acquire title by condemnation, but a jury would ... fix damages for the taking ... after the parties have already agreed between themselves as to the purchase price....

While *Manning*'s factual and legal circumstances are not exactly the same as either the instant case or any of the foreign cases, it exhibits an aversion to the position taken by appellant in the case *sub judice*. The opinion speaks, as we view it, to the Court of Appeals's preference for parties to abide by their agreements without artificial reliance on asserted technical requirements of the statutes governing the procedural aspect of the condemnation process. Accordingly, we agree with the reasoning of the Connecticut courts.

We hold that when a condemnor of property also has a valid contractual right to purchase that property at a specific price from the condemnee, that purchaser can enforce the contract. The condemnee's interest in the subject property is limited to the contract price. Even if the transaction is forced into the condemnation arena, that contract price then becomes the value of the property for condemnation purposes. Additionally, we hold that the purpose of Real Property Article section 12–109's prohibition against an abandonment after a taking has occurred is to forbid the State to abandon the acquisition of the property, not to limit the method of that acquisition. The purpose of the abandonment prohibition is to

protect the landowner from loss of use of property that is never subsequently fully acquired by the condemnor, not to afford to the landowner the power to require that a specific method of acquisition be used. Under appellant's reasoning, a landowner could not even give his property to the condemnor once condemnation proceedings were instituted. Such a result would be absurd.

More important, and more directly relevant to the issue here asserted by appellant, *i.e.*, that the State may not require the specific performance of the contract because it would result in an improper abandonment of the condemnation proceedings, is the juxtapositional comparison of section 12–101, Application of Title, of the Real Property Article with section 8–302, General Power to acquire private property, of the Transportation Article.

Section 12–101, in relevant part, provides "this title does not prevent the State Roads Commission from using the procedures set forth in Title 8, Subtitle 3 of the Transportation Article." Md.Code (1974, 1996 Repl.Vol.), § 12–101 of the Real Property Article. Section 8–302(a), Acquisition of property, of the Transportation Article provides, in relevant part, that "[t]he Administration may acquire ... by condemnation ... *or by lease, agreement, gift, grant, purchase, or otherwise,* any private property." Md.Code (1977, 1993 Repl.Vol.), § 8–302(a) of the Transportation Article.

Section 8–325 provides that the Commission, even after a condemnation suit is filed and a taking occurs, may seek to acquire the property by negotiations, albeit "amicable" negotiations. See Md.Code (1977, 1993 Repl.Vol.), § 8–325 of the Transportation Article. If the parties can enter into an amicable contract while condemnation is in process without running astray of the abandonment prohibition, we see no reason why a prior contract, amicably entered into at the time made, may not be enforced after condemnation has been commenced. To hold otherwise would also be absurd.

Accordingly, we hold that the State's efforts to acquire the property at issue here through enforcement of the

rights it acquired by contract do not constitute an improper abandonment of the condemnation proceedings. We hold further that the statutes we have described permit the State to proceed on dual track acquisition efforts simultaneously without violating the abandonment prohibition of section 12–109 of the Real Property Article.

For the reasons we have stated, we shall affirm. We feel it appropriate to note that Judge Sweeney's logical analysis of the issues presented here was right on point.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**