**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

**No. 05-1414**

————————————

TROY BOSS,

                                        Plaintiff - Appellant,

        versus


NISSAN NORTH AMERICA, INCORPORATED, d/b/a
Nissan Motor Corporation in U.S.A., a foreign
corporation; NISSAN DESIGN AMERICA,
INCORPORATED, a foreign corporation; NISSAN
DESIGN INTERNATIONAL, INCORPORATED, a foreign
corporation; NISSAN TECHNICAL CENTER NORTH
AMERICA, INCORPORATED, a foreign corporation;
NISSAN MOTOR COMPANY, LTD, a foreign
corporation,

                                        Defendants - Appellees,

        and


JIFFY LUBE INTERNATIONAL OF MARYLAND,
INCORPORATED; EBERLE ENTERPRISES; ELIZABETH A.
ALDRIDGE,

                                        Defendants.


————————————

**No. 05-1442**

————————————


TROY BOSS,

                                        Plaintiff - Appellant,

        versus

JIFFY LUBE INTERNATIONAL OF MARYLAND, INCORPORATED; EBERLE ENTERPRISES,

Defendants - Appellees,

and

NISSAN NORTH AMERICA, INCORPORATED, d/b/a Nissan Motor Corporation in U.S.A., a foreign corporation; NISSAN DESIGN AMERICA, INCORPORATED, a foreign corporation; NISSAN DESIGN INTERNATIONAL, INCORPORATED, a foreign corporation; NISSAN TECHNICAL CENTER NORTH AMERICA, INCORPORATED, a foreign corporation; NISSAN MOTOR COMPANY, LTD, a foreign corporation; ELIZABETH A. ALDRIDGE,

Defendants.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (CA-02-4082-JFM)

---

Argued: February 1, 2007                    Decided: May 22, 2007

---

Before WILKINSON, WILLIAMS, and MICHAEL, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** James Joseph Pettit, LOCKS LAW FIRM, L.L.C., Cherry Hill, New Jersey, for Appellant. Joel Allen Dewey, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** Thomas L. Gowen, LOCKS LAW FIRM, L.L.C., Philadelphia, Pennsylvania, for Appellant. Kathleen M. Bustraan, LORD & WHIP, P.A., Baltimore, Maryland, for Appellee Jiffy Lube of Maryland, Inc.; Douglas Biser, Matthew Lalumia, MUDD, HARRISON & BURCH, L.L.P., Towson, Maryland, for Appellee Eberle Enterprises; Jeffrey M. Yeatman, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Baltimore, Maryland, for Nissan Appellees.

---

2

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Troy Boss, a high school student, was severely injured when the car he was riding in overturned. Boss sued the car manufacturer, Nissan North America, Inc., and several of its corporate affiliates (collectively, "Nissan") in Maryland state court, alleging that the car's power steering system was negligently designed. He also sued three in-state defendants, claiming, among other things, that they negligently failed to inspect, change, or warn the car's owner to change, the power steering fluid. Nissan removed the case to federal court, saying that Boss fraudulently joined the nondiverse defendants to destroy federal jurisdiction. The district court agreed, dismissed the nondiverse defendants, and denied Boss's motion to remand. A year later, the district court disqualified Boss's expert witnesses under Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and granted summary judgment to Nissan. We affirm.

I.

On August 27, 1997, Stacey Harmon, a sixteen-year-old high school student, drove her 1987 Nissan Sentra to a McDonald's after school. Four other teenagers, including Troy Boss, rode with her. After the McDonald's stop, Harmon drove with her passengers to a Papa John's restaurant, where they happened upon a friend whom they agreed to follow to her grandmother's house. On the way,

4

Harmon came to a left-hand curve in a two lane road. As Harmon steered through the curve, the Sentra crossed the double yellow line into the other lane. In order to avoid an oncoming pick-up truck, Harmon quickly steered back to the right. This sudden change in direction caused the car to roll over several times before coming to a stop in a meadow adjacent to the road. Boss was severely injured in the crash and is now a paraplegic.

The events leading up to the crash are disputed. Two eye-witnesses, including one of Harmon's passengers, said that Harmon was speeding and driving recklessly. Harmon states that she was driving 30-35 mph, the speed limit, when the steering wheel suddenly "jerked completely out of [her] hands." J.A. 879.

Boss sued Nissan in Maryland state court. He alleged that a particle became lodged in the spool valve of the power steering system, blocking the flow of power steering fluid. This sudden loss of power steering, he says, caused Harmon to lose control of the vehicle. He claimed that the particle filter in the vehicle's power steering system was defectively designed and that Nissan negligently failed to warn its customers of the need to change the power steering fluid and filter periodically.

Boss joined three Maryland residents as defendants in the suit: Elizabeth Aldridge (the former owner of the Nissan), Eberle Enterprises (the company that conducted the Maryland safety inspection), and Jiffy Lube of Maryland, Inc. (the company that

5

allegedly serviced the steering system shortly before the accident). Boss claimed that Aldridge and Eberle negligently represented the car to be in safe condition and that Jiffy Lube negligently failed to change the power steering fluid. All parties, except for Nissan, are Maryland residents.

The Maryland defendants then filed a motion to dismiss. The state court denied the motion and allowed twelve months for discovery, to end in February 2003. In June and August 2002 Jiffy Lube and Eberle requested Boss to produce the documents showing the services that they had allegedly contracted to perform on the Nissan Sentra. Boss's counsel responded that the requested documents were in his office, and the parties agreed to meet there on December 13, 2002. After reviewing the documents, the defendants concluded that the documents did not support the factual allegations made in the complaint, specifically the allegations (1) that Jiffy Lube had contracted to inspect or change the power steering fluid, and (2) that Eberle falsely asserted in an inspection report that the vehicle complied with Maryland safety standards. On December 16, 2003, Nissan filed a notice of removal, see 28 U.S.C. § 1446(a), in the United States District Court for the District of Maryland, stating that there was diversity jurisdiction over the non-fraudulently joined parties. Thereafter, Jiffy Lube, Eberle, and Aldridge filed a motion to dismiss in district court. Boss filed a motion to remand to state court,

claiming that the district court did not have jurisdiction over the case.  The court denied the motion to remand and granted the nondiverse defendants' motion to dismiss.

The case continued in district court between Boss and Nissan.  In May 2004 Nissan filed a motion to disqualify Boss's four expert witnesses (Gerald Rosenbluth, Dean Jacobson, Richard Tessmann, and David Leonard), who planned to testify that a particle jam in the power steering system caused a steering malfunction.  After a <u>Daubert</u> hearing the district court granted Nissan's motion to disqualify the four experts.  The court then granted Nissan's motion for summary judgment because Boss could not make out a prima facie case without expert testimony.  Boss appeals the district court's denial of his motion to remand to state court. He also appeals the district court's order disqualifying his expert witnesses and the grant of summary judgment for Nissan.

## II.

Boss argues that the district court did not have subject matter jurisdiction over the case for two reasons.  First, he claims that Nissan did not file a timely notice of removal under 28 U.S.C. § 1446(b).  Second, he says that the district court erred in determining that Jiffy Lube and Eberle were fraudulently joined. (He does not appeal the fraudulent joinder determination as to Aldridge, the former owner of the Sentra.)  "We review de novo

7

questions of subject matter jurisdiction, including those relating to the propriety of removal and 'fraudulent joinder.'" Mayes v. Rapoport, 198 F.3d 457, 460 (4th Cir. 1999).

## A.

We conclude that Nissan's notice of removal was timely. A defendant has 30 days to file a notice of removal, starting from the date the defendant receives the complaint or from the date "it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b); see also Lovern v. General Motors Corp., 121 F.3d 160, 162 (4th Cir. 1997) ("[O]nly where an initial pleading reveals a ground for removal will the defendant be bound to file a notice of removal within 30 days."). The grounds for removal were not immediately apparent in this case because Boss pled facts, which if true, would establish a cause of action against one or more of the nondiverse defendants. Nissan did not have reason to remove the action until December 13, 2002, when Boss's counsel provided the documents that Boss relied on to establish his claims against the nondiverse defendants. Thus, the 30-day window for filing a notice of removal started on December 13, 2002. See Lovern, 121 F.3d at 162 (stating that the defendant will have "30 days from the revelation of grounds for removal"). Nissan's notice of removal on December 16, 2002, was timely because it was filed within this 30-day window and not later than one year after the commencement of the action. Id.; § 1446(b).

8

B.

The doctrine of fraudulent joinder permits a federal court to "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." Mayes, 198 F.3d at 461. A defendant alleging fraudulent joinder must show that "there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant." Hartley v. CSX Transp. Inc., 187 F.3d 422, 424 (4th Cir. 1999) (internal quotations and citations omitted); see also Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 312 (5th Cir. 2002) (stating that a defendant is fraudulently joined if there is no "reasonable basis for predicting that state law might impose liability on the facts involved") (internal quotations and citations omitted). In deciding whether the plaintiff has any chance of recovery against the defendant, the court "is not bound by the allegations of the pleadings, but may instead 'consider the entire record.'" AIDS Counseling & Testing Centers v. Group W Tele., Inc., 903 F.2d 1000, 1004 (4th Cir. 1990) (quoting Dodd v. Fawcett Publications, Inc., 329 F.2d 82, 85 (10th Cir. 1964)).

1.

We first consider whether Boss had a possibility of success against Eberle. Boss says that Eberle was negligent

9

because it "certified the vehicle to have met safety requirements . . . when the vehicle did not meet those standards, as the steering fluid was contaminated and contained metal fragments . . . and other contaminants that made the vehicle dangerous to operate, conditions that should have necessitated flushing the system and replacing the fluid." J.A. 53. To establish a claim against Eberle, Boss must show that Eberle failed to exercise reasonable care in performing the services it agreed to undertake. See 2 Restatement (Second) of Torts § 323, at 135 (1965) (stating that "one who undertakes ... to render services to another ... is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform the undertaking"); W. Page Keeton et al., Prosser and Keeton on Torts § 93, at 670 (5th ed. 1984) (stating that actor can be held liable "when foreseeable harm has resulted from reasonable reliance on a promisor to do what was promised"). The record shows that Eberle only agreed to inspect the car for compliance with Maryland's automobile safety regulations. The regulations governing this inspection do not require the steering fluid to be inspected or changed. Thus, Eberle did not have a duty to inspect or flush the steering fluid, and the company cannot be held liable for injury caused by steering fluid contamination.

Boss cannot succeed on his claim against Jiffy Lube either. Boss states that Jiffy Lube "was grossly negligent in rendering automobile maintenance and repair service in providing partial or incomplete service to the power steering mechanism and/or fluid in the subject Nissan." J.A. 62. Boss also claims that Jiffy Lube was "negligent in failing to properly instruct its customers in the proper way to maintain and/or inspect the power steering mechanisms and/or power steering fluid for contaminants." Id.

Again, Jiffy Lube only had a duty to use reasonable care in performing the services that it contractually agreed to undertake. See 2 Restatement (Second) of Torts § 323, at 135. There is no evidence that Jiffy Lube agreed to inspect the steering mechanism or power steering fluid. Indeed, Jiffy Lube submitted an affidavit from the Manager of Customer Service and Technical Support, Kenneth Williams, stating that Jiffy Lube only performed a "full service oil change ('signature service') and breather replacement" on the Nissan. J.A. 390. Williams also stated that "Jiffy Lube's approved services do not and have never included changing or inspecting power steering fluid for contaminants." Id. Jiffy Lube cannot be held liable for failing to perform a service that it did not agree, or have an affirmative duty, to undertake.

11

Boss argues that the district court prematurely concluded that he could not establish a claim against Jiffy Lube. He says that removal to federal court deprived him of two months of discovery in state court, during which time he could have acquired evidence that Jiffy Lube agreed to inspect the steering mechanism and fluid. Thus, he says, it was impossible to conclude that Boss had no possibility of success against Jiffy Lube.

The removal to federal court, however, did not cut off Boss's opportunity to continue discovery. The district court did not act on Boss's motion to remand, filed on January 14, 2003, until April 18, 2003, when it held a hearing to consider Nissan's claim of fraudulent joinder and Boss's motion to remand. Until that date (which was two months after the state discovery period would have ended) Boss could have sought further discovery and submitted to the district court any evidence showing that Jiffy Lube had agreed to inspect the steering mechanism and power steering fluid. See Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997) (stating that the district court should consider affidavits and deposition transcripts submitted by the parties in deciding fraudulent joinder); cf. Badon v. RJR Nabsico, Inc., 224 F.3d 382, 387 (5th Cir. 2000) (noting that plaintiffs did not "seek any delay in ruling on the motion to remand [after removal for fraudulent joinder] in order to produce or discover evidence in support of the motion"). Boss made no attempt, however, to rebut

12

Jiffy Lube's affidavit in the three months that his motion to remand was pending before the district court. We thus conclude that Nissan met its burden of showing that Boss had no possibility of success against Jiffy Lube. See Legg v. Wyeth, 428 F.3d 1317, 1323 (11th Cir. 2005) ("When the Defendants' affidavits are undisputed by the Plaintiffs, the court cannot resolve the facts in the Plaintiffs' favor based solely on the unsupported allegations in the Plaintiffs' complaint.").

We conclude that the district court properly determined that the nondiverse defendants were fraudulently joined. Accordingly, there is federal subject matter jurisdiction based on the diversity of citizenship between Boss and Nissan, see 28 U.S.C. § 1332(a), and the district court did not err in denying Boss's motion to remand to state court.

III.

Boss also claims that the district court abused its discretion in disqualifying his four expert witnesses: Gerald Rosenbluth, Richard Tessmann, Dean Jacobson, and David Leonard ("the experts"). The experts planned to testify that (1) the 1987 Nissan Sentra's power steering system was defectively designed, and (2) a particle lodged in the power steering system's spool valve caused a steering malfunction. Because the experts rely on the

13

same scientific theory (particle jamming), we treat them alike for purposes of the <u>Daubert</u> analysis.

A.

The power steering system in the 1987 Nissan Sentra uses hydraulic pressure to reduce the force needed to turn the steering wheel. When the driver turns the wheel, a valve opens in the power steering system. Fluid passing through the valve creates hydraulic pressure, which helps the driver overcome the "resistance of the wheels to the turning effort." J.A. 1323. At all times, however, there is a direct mechanical link from the steering wheel to the road wheels.

The experts assert that the Nissan's steering system is "unreasonably dangerous" because microscopic particles "on the order of and significantly larger than the spool valve clearance are allowed in the hydraulic system." J.A. 2044. These particles can get caught in the valve, "limiting pressurized fluid from going from the pump to the steering cylinder." Appellant's Br. at 5. According to Boss's experts this loss of pressure can cause a "sudden, unexpected, and catastrophic malfunction of the steering system," J.A. 501, until the driver applies sufficient pressure on the steering wheel to crush or shear the particle lodged in the spool valve. The force needed to crush a particle is "significantly higher . . . than would be required for simple turning." J.A. 1997.

14

The following events occurred, <u>in the opinion of the experts</u>, as Harmon entered the left-hand curve in the road: One or more particles blocked the spool valve in the power steering system, causing the steering wheel to lock up or slowly self-steer to the left.[*] As the car crossed into the opposite lane, Harmon realized that the steering wheel was not responding to her efforts to turn it. Because "normal steering force on the steering wheel was not sufficient to overcome the obstruction caused by the particles," she "violently jerked" the wheel to the right, dislodging the jammed particle. J.A. 1998. As steering fluid passed back through the spool valve, the steering wheel turned hard to the right, and the car overturned.

B.

Expert testimony must be both reliable and relevant. <u>See</u> <u>Daubert</u>, 509 U.S. at 589; Fed. R. Evid. 702. After reviewing the record, we conclude that the testimony was neither. Thus, the district court did not abuse its discretion, <u>see</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999), in refusing to admit this testimony.

---

[*]The experts disagree on what effect a particle jam would have on the car. One of the experts says that a particle jam caused Harmon's car to "self-steer" to the left. J.A. 1383. Another expert says that the particle jam froze the steering wheel, causing the car to "continue to turn left when the road straightened out." J.A. 1998.

1.

In determining whether testimony based on scientific knowledge is reliable, the court should consider a number of factors, including: whether the scientific theory can be or has been tested; the known rate of error; whether the theory has been subjected to peer review and publication; and whether it has achieved general acceptance in the relevant scientific or expert community. Daubert, 509 U.S. at 593-94; United States v. Crisp, 324 F.3d 261, 265-66 (4th Cir. 2003).

The experts' testimony that a particle jam occurred is speculative. There is no physical evidence that a particle became lodged in the Nissan's spool valve. The examination of the car's steering system and power steering fluid only showed that there were a "significant number of particles" that were capable of blocking the spool valve. J.A. 2046. (This finding was expected because all power steering fluid contains such particles.) The experts cannot draw any reliable conclusions from this finding, however, because the probability of a particle causing a jam has never been established. See J.A. 2052 ("It may never happen. It may happen occasionally. It may happen under conditions where you are able to overcome it without realizing that you have ever had a jam."); J.A. 2053 ("[Y]ou would have to do tests that I think would require probably many hundreds of thousands if not millions of

cycles in order to generate the probabilities."). Thus, the experts can only say that a particle jam <u>could</u> have occurred.

Assuming a jam did occur, Boss's experts do not rely on any field tests to support their testimony that a particle jam would cause the steering wheel to lock up or self-steer. Furthermore, their conclusion that resistance on the steering wheel caused Harmon to oversteer to the right is also unreliable because the experts have not determined how much force would be required to crush or shear a lodged particle. <u>See</u> J.A. 1768 ("I don't have any idea how much . . . force would be [needed to dislodge the particle], but it would be something."); J.A. 1407 (admitting that "[t]he particle could have dislodged itself with a very minimal, nondiscernible elevated steering input"). Thus, even if a particle did block the spool valve, the experts have no basis for concluding that it affected Harmon's control over the vehicle.

The risk of steering malfunction caused by particle jamming is not generally accepted in the engineering community. A study conducted by the National Highway Traffic Safety Administration (NHTSA) determined that particle jamming did not pose a risk to drivers. General Motors, which contributed to the study, stated that "a lockup due to metal particles . . . in the power steering fluid at the spool valve location can not occur" in steering systems with a direct mechanical link between the steering wheel and the road wheels. J.A. 1116. Likewise, Ford Motor

17

Company concluded that a particle jam would not cause anything beyond "inconsequential, momentary interferences with the steering that would be easily overcome by the driver." Id. The NHTSA also reviewed 36 lawsuits in which plaintiffs alleged that a particle jam caused a steering malfunction and concluded that "assignment of the fatalities to the power steering spool valve or the power steering system [was] not logical." J.A. 1117.

Despite the lack of scientific evidence or testing, the experts say that a particle jam must have occurred because it is the only plausible explanation for the crash. (They rule out other mechanical failure, as does Nissan, because the post-accident inspection of the vehicle did not reveal any defects in the car.) The experts, however, simply assume that human error did not cause the crash. See J.A. 1218-19 (offering "no opinion as to whether or not driver error was the cause of the accident"). This assumption, combined with the lack of any evidence showing that a particle jam did occur, makes the experts' testimony unreliable and speculative.

2.

Expert testimony must also be relevant. In other words, it must "assist the trier of fact to understand the evidence" presented at trial. Fed. R. Evid. 702. The testimony of Boss's experts cannot perform this function because the experts assume facts that are inconsistent with the other evidence presented by

18

Boss, specifically Harmon's testimony. See Daubert, 509 U.S. at 591 (stating that there must be a logical connection between the expert's theory and the facts of the case).

The experts, for example, say that a particle jam caused the steering wheel to either freeze up or slowly self-steer to the left. Harmon, however, testified at her deposition that the steering wheel suddenly "jerked [ninety degrees] to the left." J.A. 793. Because the particle jam theory cannot explain the occurrence described by Harmon, the experts simply ignore her testimony. See J.A. 1385 (stating that the car's movement to the left "may have seemed instantaneous to her, but it didn't happen instantaneously"). The experts also say that Harmon oversteered to the right because she felt significant resistance when she first attempted to turn the wheel. Harmon testified that she never felt any resistance on the steering wheel, which felt "very loose." J.A. 794. Again, Boss's experts dismiss Harmon's testimony, saying, "These folks suffered a trauma. They rolled over a vehicle. So she is giving you the best of her recollection." J.A. 1406.

In sum, the experts' testimony is neither reliable nor relevant. The tests performed on the particle jam theory only establish that a particle jam could affect the steering mechanism. There is no evidence, however, that a particle jam actually occurred in this case or that it caused the steering system to

19

malfunction.  Moreover, the testimony is not relevant because it is inconsistent with the driver's own account of the accident.  Thus, the district court did not abuse its discretion in disqualifying Boss's experts.

IV.

For the foregoing reasons we affirm the district court's order denying Boss's motion for remand.  We also affirm the district court's order disqualifying Boss's expert witnesses.  Because Boss cannot establish a prima facie case of product liability without expert testimony, we affirm the order of summary judgment in Nissan's favor.

AFFIRMED